ATLAS UNDERWEAR CO. v. COOPER UNDERWEAR CO.

(District Court, E. D. Wisconsin. December 3, 1913.)

1. INJUNCTION (§ 98*)—GROUNDS—INJURY TO TRADE OR BUSINESS.
While the owner of a patent may protect his interests by notifying the world in general or any person in particular of his rights and cautioning against infringement, he may not seek to enforce such rights by terrorizing the trade or customers of a competitor through a succession of threats which he never attempts to carry out, and a court of equity will enjoin such acts.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 169–171; Dec. Dig. § 98.*]

2. INJUNCTION (§ 98*)—GROUNDS—INJURY TO TRADE OR BUSINESS.
Defendant as owner of a patent for a union suit of underwear of the "closed crotch" style, which it manufactured, claiming that the patent was of a pioneer character and so broad as to cover all garments of that style, through trade circulars and advertisements in trade papers announced its claims, and its intention to enforce its rights, intimated that the United States would stop the business of all infringers and in effect advised dealers not to handle articles which might get them into trouble. It also referred to claims in pending patent applications and endeavored to con-

vey the impression that they had the effect of claims in an issued patent. It brought no suit, although complainant and other competitors of defendant had for a year or more been openly making and marketing garments of the closed crotch style, denying infringement. *Held*, that such acts were not within defendant's rights, but were unfair and tortious and would be enjoined at suit of any manufacturer injured thereby.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 169–171; Dec. Dig. § 98.*]

3. INJUNCTION (§ 107*)—RIGHT OF ACTION—INJURY TO TRADE OR BUSINESS.

That such circulars and advertisements did not explicitly refer to complainant, but were general in their terms and with a single exception referred to all infringing manufacturers as a class, did not relieve defendant from liability to suit by complainant, where they in fact influenced its customers to its injury in common with those of other manufacturers, as they were calculated and intended to do.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 181–183; Dec. Dig. § 107.*]  •

4. COURTS (§ 343*)—PARTIES—INTERVENTION.

New Equity Rules 30 and 37 ·(201 Fed. v, 198 Fed. xxviii) do not entitle one not a necessary nor proper party to a suit to intervene to set up a counterclaim which has no bearing on the issues.·

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 915, 916, 919, 920; Dec. Dig. § 343.*]

In Equity. Suit by the Atlas Underwear Company against the Cooper Underwear Company. On motion for preliminary injunction. Granted.

The case comes before the court upon a motion for a preliminary injunction. The complainant is a corporation located at Piqua, Ohio, and manufactures underwear, particularly of the type commonly known as union suits. Its product is averred to be of high quality, received with general favor in the trade throughout the United States, and as a consequence thereof the complainant enjoys a high reputation, and has established a profitable business. The defendant is a competitor, located at Kenosha, Wis. It has also made a specialty of the manufacture and sale of the style of underwear known as union suits.

The bill charges that the defendant has endeavored by unlawful and malicious means and representations to injure the complainant's business and reputation, to drive it from the field of manufacture as a competitor, by circulating letters addressed and mailed to the customers and agents of the complainant, maliciously and untruthfully informing them that the union suits of complainant's manufacture which are or may be handled or used ·by such customers of agents are infringements upon letters patent owned or controlled by the defendant; that, ·to further such unlawful and unfair policy, the defendant has circulated letters and notices intended to reach, and which have actually reached, complainant's customers and agents, maliciously and falsely stating that the defendants expected to enjoin ·under Canadian letters patent No. 148,011 the manufacture of such garments as the "Atlas" (being one of the complainant's styles of underwear) in this country. That by like letters and circulars, the customers of complainant, and complainant, are maliciously threatened with infringement litigation, by reason of the alleged infringement by complainant's said underwear, of the subject-matter of an application for United States letters patent; the purpose of such threat being to obtain exclusive rights under letters patent before issue thereof.

The defendant, to further carry out its policy of maliciously injuring the complainant and its trade, has advertised in trade publications of general circulation in the trade, and among the agents and customers of the complainant, wherein false and malicious advertisements have been published, directed against the product of manufacturers, including the complainant,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and containing misleading statements and innuendo respecting the course pursued by the United States government in summarily dealing with infringers of patent rights. That such articles are published under circumstances and are given circulation, which necessarily convey an impression that the defendant has particular reference to the product of the complainant and to the complainant's agents and customers, and that such agents and customers to construe them. That defendant has, by printed words and illustrations, and with intent to injure and ruin the lawful business of complainant, sought to and has intimidated the trade, and especially the complainant's customers and agents.

To further carry out its attempt, the defendant on November 18, 1912, threatened the complainant with a suit for infringement of letters patent No. 973,200, issued October 18, 1910. in and by reason of complainant's manufacture and sale of its said product. That the complainant on November 23, 1912, denied alleged infringement. That thereupon the defendant, by circulation of letters and notices addressed and mailed to the customers and agents of the complainant, reiterated the charge that all closed crotch garments not bearing the words and figures "Patented October 18, 1910" (which mark is not borne by the closed crotch garment made and sold by complainant) are infringements upon the defendant's product, and has repeatedly continued to do so up to the time of the filing of the bill, but has not instituted any suit against complainant nor any agent or customer thereof. Hence, it is charged, that the threats of suit, and charges of infringement made against complainant, its customers and agents, were and are not made in good faith, nor with any intention of instituting suit.

The defendant by its answer challenges the right of complainant to proceed in equity to obtain relief because of the acts charged to have been committed by the defendant. The allegations respecting the attempts to break up and destroy the underwear business of complainant, to drive it from the field of manufacture of closed crotch union suits; the circulation among customers and agents of the complainant of letters addressed and mailed to the customers, whereby defendant maliciously or untruthfully informed customers and agents of complainant that union suits of complainant's manufacture are infringements of letters patent owned or controlled by the defendant; the circulation of letters and notices intended to reach the knowledge of complainant's customers, and by which the defendant maliciously and falsely stated that defendant expects to enjoin under Canadian letters patent No. 148,011, the manufacture of garments such as "Atlas" (complainant's trade designation of its garments); and, generally, all of the allegations of the bill respecting the malicious and unlawful conduct of the defendant in the respects detailed in the bill—are severally and expressly denied.

The parties respectively offered voluminous affidavits in support of and in opposition to the motion. The facts developed through such affidavits and accompanying exhibits will be referred to in the opinion.

Duell, Warfield & Duell, of New York City, for complainant.
Offield, Towle, Graves & Offield, of Chicago, Ill., and Lines, Spooner, Ellis & Quarles, of Milwaukee, Wis., for defendant.

GEIGER, District Judge (after stating the facts as above). There are two questions presented upon this motion: First, whether the defendant has been guilty of conduct which, if directed against the complainant, is tortious, and of such a character that a court of equity will take cognizance thereof and give injunctive relief; secondly, whether the facts sufficiently disclose an attack by the defendant upon the plaintiff, so that the latter can invoke the jurisdiction for the purpose of the relief which a court of equity can give.

[1] The first of these questions involves the consideration of the facts to determine the applicability of settled principles frequently recognized in this circuit, and particularly in the cases of Commercial

Acetylene Co. v. Avery (C. C.) 152 Fed. 642; Warren Featherbone Co. v. Landauer (C. C.) 151 Fed. 130; Emack v. Kane (C. C.) 34 Fed. 46; Dittgen v. Racine Paper Goods Co. (C. C.) 164 Fed. 85; United Electric Co. v. Creamery Package Mfg. Co. (D. C.) 203 Fed. 53.

These cases, while all recognizing the elementary principle that a patentee has a right to protect his interest under a patent by notifying the world in general, or any person in particular, of his rights—cautioning against infringement thereof—recognize and enforce with equal vigor the principle that a patentee cannot, under cover of his patent and his incidental rights, harass and annoy his competitors, seek to destroy their trade, and thereby accomplish results legitimately to be accomplished through the orderly processes of infringement suits. He may not terrorize the trade by calling attention to his rights, and seek to enforce such rights through a succession of threats which he never attempts to effectuate. Does the complainant show that the defendant has pursued a policy which calls for recognition and enforcement of this latter principle? It is my judgment that it does.

[2] It may be noted preliminarily to the manufacture and sale of the style of underwear known as union suits, and more particularly the "closed crotch" garment, has developed with great rapidity in the past few years; that, while there are different types and styles, the demand for the garment has been enormous, taxing the capacity of manufacturers to meet it. The defendant claims that, under a patent owned, it originated a type of garment so greatly superior to anything previously produced that it instantly commanded favor, and, being placed upon the market, resulted in attempted appropriation by many other manufacturers. Upon the hearing its attitude approached that of charging, broadly, wholesale piracy. The complainant, on the other hand—and it seems to be representative of many other competitors of the defendant—as stoutly insists noninfringement. The warfare which has thus arisen in the trade has been spirited, ill tempered, and, as appears from trade publications and affidavits presented, carried on unceasingly; so that, without doubt, the trade, so far as it includes dealers and retailers, has been in a state of alarm and panic, no one apparently knowing what, if any, immunity there was in purchasing any type of underwear claimed to be covered by letters patent. In this situation the defendant has insisted that it was the possessor of a pioneer patent; that by virtue thereof its rights were unquestioned and were perfectly clear, and it has, through repeated circulars, called attention to its claim respecting the pioneer character of its patent, and has pointed out to the whole trade the dire consequences which must ensue from the purchase by any one, without its license, of underwear not bearing the date of its patent. In view of the widespread infringement, according to the view of the defendant, and particularly in view of the rapid development which confessedly has taken place in the last two years, it would seem that the duty rested peculiarly upon the defendant promptly to assert its right by instituting suits to restrain wrongful infringement of its patent, rather than by inaugurating and carrying on a system of terrorizing the trade.

In the consideration of the questions presented in this suit, obviously the merits of the infringement controversy are not before us. It will be assumed that the defendant herein is a patentee; that the complainant is charged to be an infringer; and, as indicated, that the defendant, as a patentee, may assert and protect its rights in the manner hereinbefore indicated. For the purpose of determining, as it must be determined upon this motion, the issue of fact whether the defendant has used, or attempted to use, its privilege as a patentee as a cover or cloak to wage competitive warfare, seeking to advertise its own and destroy the trade for its rival's wares, the following considerations are pertinent:

In the first place, if the complainant is an infringer, its acts have been open, long-continued, and clearly defiant. The whole situation appears as one in which the defendant asserts its ownership of a pioneer invention and complainant and a dozen or score of other manufacturers have been in an attitude of open hostility and defiance to and against the broad claim made by defendant that the former, in so far as they make a "closed crotch" garment, are guilty of piracy. This appears to have been the situation for about a year prior to the filing of this bill. It is abundantly shown that the defendant, through a repetition of circulars sent to the trade by mail, or through trade journals, apprised every one interested in the sale of the garment in question, of the defendant's claim as patentee, and, as will hereafter be shown, has made use of such circulars to accomplish results obviously beyond the mere assertion of its rights as patentee. The question at once arises, if there is merit in defendant's contention respecting the pioneer and comprehensive character of its invention, why has it permitted the complainant and the other manufacturers to gain great headway in establishing in the trade, garments made by them, when recourse to an infringement suit would instantly have brought the situation to a point where the defendant's rights could not only have been asserted, but, if meritorious, enforced, and further infringement prevented and past wrongs redressed?

In the next place, what has just been referred to is peculiarly significant in view of the fact that all the defendant's circulars, notices, and advertisements, make, or attempt to make or intimate, the broad claim that by virtue of the patent which was issued to the defendant, it has within its exclusive control every shape of men's closed crotch garment suit. Whereas, the complainant—and probably other competitors—make the definite claim that the garment of their manufacture is not covered by the claims granted to the defendant in its patent.

In support of this attitude the complainant calls attention to a circular sent by the defendant, either to the trade, or to persons who were in a position through its use to influence prospective purchasers of garments, wherein attention is called to a suit instituted by the defendant against Browning, King & Co. for infringement of letters patent No. 973,200, and in which the defendant calls attention to a Canadian patent in the following language:

"Kenosha, Wis., June 18, 1913. This is to notify you that we have brought suit against Browning, King & Co. for infringement of our patent No. 973,200. We also have other infringement suits started under other patents. It is our

intention to protect these patents fully and would call your attention to a recently issued Canadian patent, their number, 148,011.

"We would call your attention to this Canadian patent for the reason that it is the same as the patent that we have now pending in the United States, and which we. expect to have issued to us at an early date.

"If you send for the Canadian patent, we would call your attention particularly to claim No. 4, which you see will stop the manufacture of every form of a practical imitation closed crotch union suit. We expect, under this patent, to stop the manufacture of such garments as the Atlas, the Clark, the Globe, and others of the same character.

"We are writing you this in order to keep you posted, and for the reason that we think you can use the information to advantage in the marketing of your goods."

The garment referred to as "Atlas" is of complainant's manufacture.

A third fact—and one whose significance it is quite impossible adequately to disclose in an opinion—is found in an advertisement in a well-known trade journal. In part it is a picture, at one side of which appears a large factory building, over which, in bold type, is the word "Genuine." At the other side of the page appears another building over which in large type is the word "Imitation." This latter building is apparently being destroyed, crushed, or crumbled, through the power of an enormous hand which is labeled "U. S."—doubtless intending to symbolize the strong arm of the law. Below this picture, in large bold-faced type, is the following:

"Look Out for Uncle Sam.

"Right now Uncle Sam is busy unmaking vast businesses because they have violated his laws. He unmakes businesses that infringe patent rights even more readily than he dissolves a trust.

"Kenosha—Klosed—Krotch.

"Uncle Sam is no respecter of persons. If you own an automobile, you will remember the recent famous case of the Weed Tire Chain Co., and how Uncle Sam handled this case, putting the infringer out of business and saddling him with a heavy fine.

"We make this point; because if you are so unfortunate as to be handling one of the number of closed-in-the crotch union suits that infringe the patents that Uncle Sam gave us Oct. 18, 1910, there is a very fair chance of a court order suddenly legislating your source of supply out of existence.

"This means that your sincere effort to build up a closed-in-the crotch union suit business would all go for naught.

"Uncle Sam has expressed his opinion on this subject. His patent office granted us an exclusive patent for pioneer invention, the Kenosha-Klosed-Krotch, which is found in all White Cat union suits.

"This means that not only every infringing manufacturer lays himself open to an entire loss of business, based on the infringement, but that every dealer· and jobber who handles his goods may have his supply cut off by an order of the United States Supreme Court, while he, the dealer, may be made the 'goat' of an expensive law suit."

This advertisement, which covers two large pages of a trade journal, in addition to the literature above quoted, urges dealers not to handle an article which may get them into trouble.

The circulars also deal with pending patents and the claims therein involved, and in fact assert a purpose to enforce the claims as made, even though they have not been allowed and covered by an issued patent; and, as I read them, they are framed to convey the impression, not that the claims are now in the Patent Office subject

to proceedings there pending, but that they in reality have the effect of an issued patent. This is done particularly by quotation of conclusions expressed by the Board of Examiners upon a patent appeal; but inasmuch as the character of the proceeding is not disclosed in the article, the layman, as I view it, necessarily regards the expression as a conclusion of a tribunal upon the precise question of infringement which is in controversy between the complainant, other manufacturers, and the defendant.

The defendant has not, in my judgment, met the inferences, legitimately to be drawn from its conduct thus disclosed. Upon argument of the motion, it was claimed that the failure for so long a time to institute infringement suits which the complainant and other manufacturers had, either directly or by their open defiance invited, was due to a desire on the part of defendant to await full disclosure by its rivals of the attitude of certain parties to interference proceedings pending in the Patent Office. This clearly would not justify the circularizing of the trade in the manner noted. It was the privilege of the defendant to defer institution of suits for any reason or for any length of time it saw fit; but it could not, at its option, either sue or adopt a policy of annoying its competitors.

With respect to the publication of the picture and its accompanying threats that the government "unmakes businesses that infringe patent rights even more readily than he (it) dissolves a trust," referred to, counsel for defendant, instead of attempting seriously to justify it, sought to minimize its importance and to treat it as harmless because of its obvious grotesqueness. It may be conceded that when subjected to proper standards it would not be awarded high artistic or literary merit. The award of such merit, however, is not primarily, what is sought to be attained in expensive advertising. Though not possessing other qualities, the advertisement was unquestionably calculated to be, as it is, an effective agency to "scare" defendant's rivals. No other view can reasonably be entertained.

Further reference to, or discussion of, the facts is not needed to justify the conclusion that the defendant's conduct has been unfair and tortious within the principles of the cases referred to.

[3] This brings us to a consideration of defendant's contention that the motion for an injunction must be denied because the proofs fail to disclose a course of conduct which involves, or is directed at, the plaintiff, specially; that whatever defendant has done was done respecting a class, no member of which can claim to have been specially wronged to enable him or it to invoke individually the equitable jurisdiction. This is supported by reference to the analogous rule found in the law of libel and slander, that statements made regarding the public, or a class generally, do not and cannot by way of inducement or innuendo apply to particular individuals who constitute such class, or the public.

It will be noted that, howsoever general are the terms of the literature sent out by the defendant, the complainant was doubtless a manufacturer and an alleged infringer specially in mind as one to be conquered in the campaign which was being or to be conducted. In the

circular already quoted (which defendant claims was in fact confidential and sent only 'to licensees or jobbers, but which, upon the prompting of some one found its way into the trade publications) it is stated:

> "If you send for the Canadian patent, we would call your attention particularly to claim No. 4, which you see will stop the manufacture of every form of a practical imitation closed crotch union suit. We expect, under this patent, to stop the manufacture of such garments as the Atlas, the Clark, the Globe, and others of the same character."

Granting that this circular was sent out for limited purposes; that it was not intended to serve (directly, at least) the same purpose as the others—it shows the defendant pointing out complainant as one of an ascertained or ascertainable number or class whom or which it intended to reach. However, the broad view upon all of the facts disclosed does not, in my judgment, permit escape for the defendant upon the contention thus advanced. This may be taken as illustrative of the situation presented: A., a manufacturer, conceives B., C., and D. to be infringers. He can, of course, deal with them individually or regard them as a class—as constituting a body each of whom is trespassing upon his rights. He opens a campaign of sending threatening circulars and publishing threatening advertisements which are received by or come to the attention of E., F., and G., customers respectively of B., C., and D. Although the latter are not named or referred to specifically, their respective patrons are at once put in a state of alarm, and a situation threatens such as that described in the Dittgen Case (C. C.) 164 Fed. 85.

> "His orders are countermanded, old customers desert him through fear of litigation, or demand bond of indemnity as a condition of placing orders. His business is melting away. Everywhere the trade is apprehensive of 'peremptory measures' if they buy goods of an infringer. * * * Customers will not listent to his explanation or denials, and unless he can get relief in a court of equity, his business, which represents 20 years of effort, will be entirely ruined by a competition which is malicious and unfair."

In the present case, the proofs are abundant that the customers of complainant, and also other manufacturers, in fact, the whole closed crotch garment trade, have been thrown into a state of alarm and panic, and that complainant and the other manufacturers have had to face a situation threatening many of the serious consequences above indicated. To recur to the illustration which we have used: Can or ought A. to be heard to say that the threatened consequences of his acts were not intended? Should he be heard to say that, if B. has suffered wrong, it is irremediable because his (A.'s) conduct was directed against a "class" which includes also C. and D.? If he can, then the wholesome doctrine of the cases to which we have referred will be of academic value only. The choice of another equally effective method of achieving the same results will render it inapplicable. The wrongdoer goes acquit because he proceeded by indirection. If this view were entertained, then the defendant before us may be permitted to say that complainant's customers were not justified in becoming panic stricken because the circulars referred to no one in particular. Yet, if these customers, instead of evincing a desire to

remain loyal to complainant, had turned their patronage to the defendant, could the latter in fairness deny that it had achieved against the plaintiff, at least one of the very victories for which its campaign was carried on? Manifestly it could not; and when the defendant's conduct is as directed, not against a class or body not resolvable into individuals, but merely against a large number of individuals whose identity and individuality is rendered certain by sending circulars and the like to their respective customers; and when the conduct is such as at once inculcates the belief that each of the individuals whose identity is thus disclosed, was and is intended to be reached, then the analogy drawn from the law of libel fails. The situation, it seems, is then either well within the exceptional rule in libel, where the surrounding circumstances may be shown to make certain the libel of an individual; or it is within a broader elementary principle which requires the patentee to respond for the conduct which is wrongful, whenever it is shown that injury to an individual is a consequence attributable thereto.

[4] Pending the motion for an injunction, Henry S. Cooper asked leave to intervene herein, also, for an order making Horace G. Johnson a party, to the end that, with such parties in the suit, they, or such of them as so desired, could by counterclaim set up a cause of action against complainant for infringement of the letters patent No. 973,-200—being the infringement asserted by the defendant in its conduct which is the subject-matter of the bill before us.

Justification for the motion is sought in New Equity Rules, Nos. 30 (201 Fed. v) and 37 (198 Fed. xxviii), the latter embodying the familiar doctrine of adding as parties those whose presence is necessary or proper to a "complete determination of a cause," and permitting intervention by any one claiming "an interest in the litigation," while the former relates to counterclaims. If the defendant Cooper Underwear Company were alone seeking to assert a counterclaim of the character noted, it might present the interesting question whether it should be allowed in view of the ruling of this court in the recent case of Adamson v. Shaler (D. C. Wis. filed November 10, 1913) 208 Fed. 566, wherein the scope of rule 30 respecting counterclaims is considered. But the filing of the counterclaim in the present case depends upon first admitting new parties. Now, as we have indicated, the controversy tendered by complainant's bill must be settled irrespective of the merits of any infringement issue which the defendant may at any time or place tender against complainant. The latter may be an infringer and still prevail in the suit. Therefore, though Cooper and Johnson may each have such an interest in the patent as makes him a necessary or proper party to an infringement suit, which concerns only the defendant's alleged unfair conduct, neither can be said to be necessary or proper to its determination. These considerations are alone sufficient for a denial of the motion.

The conclusions are that a temporary injunction be awarded to complainant; that the motion for admission of Cooper and Johnson as parties be denied.