## JOHNSON et al. v. BROWNING KING & CO.

(District Court, E. D. Wisconsin. February 26, 1917.)

1. Patents &#9758;168(2)—Record may be resorted to in determining presumptive validity of broad interpretation.

Though a suit for an infringement of a patent does not involve merely a review of the Patent Office proceedings on the record there made, such record, disclosing that patentee's insistence on a broad pioneer disclosure was not accepted by the Patent Office, may be most persuasive in determining whether recognition of presumptive validity, because of the issuance, shall be great, ordinary, or slight, and whether it may attach as well in support of a broad as of a narrow scope.

2. Patents &#9758;328—No. 973,200, claim 1, for union suit, held anticipated.

The Johnson patent, No. 973,200, claim 1, which covered broadly any union suit having a permanently closed crotch and an opening extending from the waist line down into one leg, held void for anticipation.

3. Patents &#9758;328—No. 973,200, claims 2 and 3, held not infringed.

The Johnson patent, No. 973,200, claims 2 and 3, covering a specific construction of a union suit having the posterior opening extend from one side of the waist line down into the opposite leg, held not infringed by defendants' garment, in which the opening was vertical.

In Equity. Suit by Horace G. Johnson and another against Browning King & Co. for infringement of a patent. Bill dismissed.

Offield, Towle, Graves & Offield, of Chicago, Ill., and Lines, Spooner & Quarles, of Milwaukee, Wis., for plaintiffs.

Duell, Warfield & Duell, of New York City, for defendant.

GEIGER, District Judge. Complainants sue, charging defendant with infringing letters patent 973,200, issued to plaintiff Johnson, October 18, 1910, upon an application filed September 25, 1909. The defenses are anticipation, lack of invention, and noninfringement.

The invention, the patent states—

"relates to that class of underwear known as union suits, and has for its chief object to provide an improved construction of such garments permitting the use of a permanently closed crotch, and dispensing with the use of double flaps, or a single wide drop-fall or flap, with their numerous fastenings, hitherto used to cover the posterior opening, while at the same time presenting a posterior opening of ample dimensions for the required purpose, covered by a single flap capable of being secured by a single button or other fastening. In other words, my present invention is designed to supply a garment combining in its construction the two most essential requisites for comfort and convenience in garments of this character, namely, a permanently closed crotch, and a posterior opening of ample dimensions and convenient location, that will not gap to expose the person, and closed by a single flap requiring but a single button or equivalent fastening."

A description of the invention, as given by the patentee, is addressed to the practice in the art of making this type of undergarment out of the "tubular blank," being the form in which the goods, at the initial stage of cutting and manufacture, are formed. Thus, of figures 3 and 4, which serve as well for description of the invention as for the manner of proceeding to cut a garment, it is said:

"Referring more particularly to Fig. 3, which shows the tubular blank turned inside out, a part of the rear body and leg portion is cut out, in the lines *a–b*, *b–c*, and *c–a*; and preferably oblique transfer cuts *a–d* and *e–b* are made in the rear body and leg portions opposite the extremities of the excised portions *a*, *b*, *c*, thereby forming a temporary inner flap member *K*, bounded by the lines *d–a*, *a–b*, *b–e*, *e–f*. I next form, from a separate piece of cloth, an external flap *L*, having the irregular form shown most plainly in Fig. 2 (below) and bounded by the lines *g–h*, *h–i*, *i–j*, *j–k*, *k–l* and *l–g*."

Fig. 2.

This reference to the figures and descriptive matter of the patent, therefore, shows the improvement to consist in an opening formed by a defined excision in the rear view of the garment, Fig. 2, indicated by the dotted lines $l-j$ and $l-k$; The line $k-j$ being the seam of the gusset $M$ (Fig. 4). This excised opening, the patentee states, is covered by the flap $L$ forming the seat or posterior of the garment.

The patentee's own description is then summarized as providing:

" * * * In the rear of the garment and extending from the line $l-g$ in the back *obliquely* down to line $l-j$ in one leg, below the crotch, a posterior opening defined by the line $l-j$ and guarded by the inner wall member $K$, constituting a part of the body and leg of the garment itself, and the outer wall member comprising the flap $L$."

Again:

"From the above it will be seen that my invention provides a garment having a permanently closed crotch and a posterior opening extending from a point near the waist line to a point below the crotch in one leg only. By carrying this opening obliquely from a point substantially in the waist line down to a point on the inner side of the leg below the crotch I provide an opening of ample dimensions, not requiring twisting or lateral displacement of the intermediate portion of the garment when in service. This opening is fully protected by the single stiched-in flap $L$, requiring to be buttoned at but a single point to effect a perfect closure."

And the claims of the patent are:

"1. An undergarment having a permanently closed crotch and a posterior opening extending from a point near the waist line to a point below the crotch in one leg only, substantially as described.

"2. An undergarment having a permanently closed crotch and a posterior opening extending from substantially the waistline at one side of the center to a point in the opposite leg below the crotch, the inner wall of said opening being formed by a part of the body and leg portions of the garment and the outer wall being formed by a sewed-in flap having the free portion adapted to button over and close said opening on its outer side, substantially as described.

"3. An undergarment having a body and leg portions thereof cut to form an oblique posterior opening extending from substantially the waist line across the seat to a point in the opposite leg below the crotch and an inner flap coextensive with said opening, and an outer flap, said inner and outer flaps and body portion being sewed together at the top of the posterior opening, and said inner and outer flaps and leg portion being sewed together at the bottom of said posterior opening, and said outer flap having a free por-

tion adapted to button over and close said opening on its outer side, substantially as described."

It will be observed that these claims severally present as the elements of the improvement in an undergarment:

(1). In claim 1: (1) A permanently closed crotch; (2) a posterior opening extending (*a*) from a point *near* the waist line to a point (*b*) below the crotch (*c*) in one leg only.

(2) In claim 2: (1) A permanently closed crotch. (2) A posterior opening from (*a*) *substantially* the waist line at one side of the center to (*b*) a point in the *opposite* leg below the crotch. (3) An inner wall of the opening being formed (as described). (4) An outer wall (of the opening) being formed by a sewed-in flap. (5) The flap having a free portion adapted to be buttoned so as to close the opening on its outer side.

(3) In claim 3: (1) An *oblique* posterior opening (cut out of the body and leg portions) extending (*a*) from substantially the waist line *across* the seat to a point (*b*) in the opposite leg (*c*) below the crotch, and an inner flap, etc.

If the contention in this case were whether the patentee's object to supply a garment having (1) a permanently closed crotch, and (2) a posterior opening of ample dimensions and convenient location closed by a single flap, was attained through the constructions embodied in claims 2 and 3, the issue of infringement alone would probably determine the case in favor of defendant; for, as hereinafter indicated, not alone is defendant's garment, but also plaintiff's commercial garment, so essentially at variance from the limited form of construction disclosed in these two claims, as well as the specifications and drawings, that infringement cannot be said to be shown to the requisite degree of clearness. But the plaintiff's contentions respecting the validity, scope, and infringement of claim 1 are such that, if tenable, they give to the patent, as defendant contends, an importance equaled by the insignificance which must be given an apparently crowded paper and practical art.

The contentions of the parties upon this claim require an examination of the art and the history of the patent as disclosed in proceedings to obtain its allowance. It may be assumed permissible to refer to such history for the purpose of considering the application of language found in the present claims and specifications to the drawing—certainly when such language gives great scope to a claim and the drawings indicate a restricted idea. Upon the application as first presented the patentee, as at present, declared his chief object to be:

"An improved construction of such garments (union suits), permitting the use of a closed crotch and dispensing with the use of double flaps heretofore deemed necessary to effect closing of the posterior opening."

He proceeded:

"To this end, my invention is chiefly distinguished by the provision of a posterior opening, extending obliquely from substantially in the waist line down to a point on one leg of the garment below the crotch, with but a single flap covering said opening."

Upon this certain proposed claims were predicated, among them:

"Claim 1. An undergarment having a closed crotch and a single posterior opening, extending from substantially the waist line to a point in *one leg* below the crotch, substantially as described."

"Claim 2. An undergarment having a closed crotch and a posterior opening, extending *obliquely* from substantially the waist line to a point in the *opposite leg* below the crotch, substantially as described."

(The italicized words indicate the differences between these two claims.)

"Claim 6. An undergarment having the body and leg portion thereof cut to form an oblique posterior opening extending from substantially the waist line across the seat to a point in the opposite leg below the crotch, and an inner flap coextensive with said opening and an outer flap, said inner and outer flaps and body portions being sewed together at the top of the posterior opening and said inner and outer flaps and leg portion being sewed together at the bottom of said posterior opening, and said outer flap having a free porton adapted to button over and close said opening in its outer side, substantially as described."

A reading of these cannot but impress one with the idea that proposed claim 6 embodies the elements which are asserted to be the "chief distinction" of the invention and also subordinate elements; certainly it embodies the structure disclosed in the drawings and the then specifications. In claim 2 is found the asserted distinctive elements of an *oblique* opening extending into *one leg*. But claim 1, when finally allowed, had a breadth of language disclosing a construction without other limits than that the posterior opening *extend from substantially the waist* line to a *point in one leg below* the crotch—this, of course, if "substantially as described" be not given the limitation of the descriptive matter found in the drawings and specifications.

The Patent Office rejected all claims first presented. Three of these, 7, 8, and 9, were specific respecting the gusset insert, *M*, shown in Figs. 2 and 4. They were abandoned. The other six were rejected upon reference to the patents to Scott, 904,022, November 17, 1909, and Prue, 699,896, May 13, 1902, when considered with patent 705,070, July 22, 1902, to Graham.

It suffices for the present to say, of these references, that Prue disclosed the now conventional type of union suit having a posterior opening formed by what he calls a "vertical slit" upwardly from the crotch, covered by a single flap of quarter-oval shape, extending from such slit across the adjacent half of the seat portion of the garment. Scott discloses a construction "having an opening extending from the neck down the front and under the crotch and along the lower portion of the posterior." The opening at the posterior is closed by two sewed-in portions; the one a triangular gusset, the other likewise a gusset, but large enough to serve as a flap, so that, when sewed to the opposite side of the opening, the latter overlaps the former at the median line. Each of these is extended down into the inner leg portion of the garment, below the crotch. Graham's garment discloses an opening broadest at its base (near the lower part of the seat) and inclining upwardly and inwardly toward the median line at the top. The lower portion is a little above the crotch of the garment. The crotch is permanently closed.

This action of the Patent Office drew from applicant the criticism, respecting Prue and Scott, that—

"Neither of them discloses a garment having a closed crotch or a posterior opening extending down into the leg below the crotch. By a closed crotch, applicant intended a permanently closed crotch such as is made by sewing together or overlapping portions of a gusset or inset (as shown) or otherwise, in contradistinction to a crotch formed by overlapping portions buttoned together and intended to be opened in using the posterior opening."

Again:

"By utilizing the feature of extending the posterior opening *down into the leg of the garment below the crotch* to a point on the under side of the leg, applicant has been able to get a posterior opening large enough to be practical and at the same time to make a complete closure of the same opening by means of a flap requiring but a single fastening."

Amendments canceling the gusset claims, also adding the word "permanently" as descriptive of the closed crotch, adding a claim practically of the breadth of claim 1, another, describing the opening as "formed between a pair of lapped members," were thereupon proposed. Again, all claims were rejected, the examiner citing as a further reference the patent to Devoe, 562,287, June 16, 1896. The reference evidently was deemed pertinent as disclosing the notion—if it needed disclosure—of a posterior opening whose size, dimensions, and character depended upon extension into the leg portions of the garment below the crotch; for applicant at once proposed amendments which characterized the opening as extending into *one* leg only, adding:

"But applicant's real discovery lies in the fact that by extending the posterior opening into one leg only below the crotch, an opening of ample dimensions is provided, and one which may be practically closed by a narrow obliquely folding flap requiring but a single button. * * * "

Thereupon the examiner again rejected the claims, excepting, however, the then numbered claim 7—being the same as 6 above—which was allowed, as "it is considered to define whatever differences that exist between the construction disclosed by applicant and that shown by the art of record." Applicant then renewed his efforts, by presenting claim 1 without change; claim 2 (prior claim 4), which charterized the opening as extending "from a point in the back *above the crotch* to a point in the *inner portion of the leg below* the crotch; claim 3, describing the opening as extending from "substantially the waist line to a point in the opposite leg below the crotch," etc.; claim 4, for "an oblique posterior opening from substantially the waist line across the seat," etc. (identical in language with former claims 6 and 7); and claims 5 and 6, dealing with the "opening formed by a pair of lapped members," and the permanently closed crotch and the specific form of flap, respectively. All other claims were canceled. An extended argument on behalf of applicant reiterated the position taken upon the reference to Scott, Prue, Graham, and Devoe. Thus claim 1 is declared to represent the most "comprehensive statement of applicant's invention," and—

"Nowhere in the art cited or in the entire art can there be found any such an opening as this claim defines, wherein *part of the body* and part of *one leg only* of the garment is used for a posterior opening."

Again:

"The heart of applicant's invention is in the single opening or slit running from about the waist line to a point in one leg only well below the crotch. This feature is new. The best and preferred location of this opening, as herein shown and claimed, is from a point near the waist line above one leg, obliquely across the back, to a point in the inner side of the opposite leg below the crotch. This is also new."

It is worthy of notice that at this same time applicant refers to claim 4 (former claim 7, covering the "oblique posterior opening"), and which the examiner had on previous action declared allowable, as differing from the preceding claims "in a specific definition of the posterior opening," etc. All claims excepting the one noted were again rejected, the examiner observing that:

"Whatever differences exist between the construction covered by these claims (rejected claims 1, 2, 3, 5, and 6), in view of the prior art of record, and the allowed claim (4), are held to be mere colorable differences, and not such as would rise to the dignity of patentable invention."

An appeal resulted in the affirmance of the examiner's allowance of claim 4 and his rejection of claims 2, 5, and 6. A recommendation by the appeal board of the allowability of claim 3, if the extension of the opening be limited to substantially the waist line "at one side of the center," resulted in an amendment accordingly, and thereupon—except for a motion by applicant for rehearing—the patent issued with its three present claims.

Upon the appeal, the examiner's statement in substance is:

(1) That the language of claim 1 reads upon the Devoe construction, except that in the latter the opening was extended into both legs and not *one leg only*; but that the difference, in view of what the art disclosed respecting the use of flaps on one side only, was not patentable.

(2) That claim 2, in its breadth of language, read squarely on Devoe.

(3) That claims 3, 5, and 6 embodied mere colorable variations, and are either covered by the allowed claim or are fully anticipated by the references.

(4) That claim 4 (present claim 3) "allowed appellant ample protection for the very slight and simple change he made over said art."

That applicant, in meeting the position taken by the examiner, at the outset classified union suits in the art into "regulation open crotch," viz. Prue and Scott, and "regulation closed crotch," such as Devoe and Graham, and asserted—which is of importance in view of the testimony in the case—that:

"Prior to appellant's invention *all closed crotch union garments on the market* had *side placket openings* and a wide drop fall, which *required numerous fastenings at the waist line.*"

Without pursuing for the present the history of the patent, this position of the applicant on this important matter of fact, if accepted as true, might, and undoubtedly did, have a persuasive effect upon the appeal board. That it probably was accepted as the fact may not be surprising, in view of the ex parte character of the proceeding; for even in litigation involving this identical patent (Johnson v. Lambert, not reported) the truth of Johnson's assertion is thus accepted by District Judge Hough:

"When Johnson filed his application (September, 1909) there were, as revealed by patents and oral evidence, two distinct classes of union suits, the drop seat (Pennington, No. 816,880; Gould, 884,815; Graham, 705,070) and open crotch, the latter subdivisible into those with crotch incapable of closure (plaintiff's 5 and 6) and those with crotch closing with buttons or equivalent devices (Scott, 904,022)."

Undoubtedly this matter of fact was appreciated by applicant as of great importance in support of a claim of invention of great breadth. The primary examiner appears immovable in his purpose to take applicant's word, as found in his drawings and specifications, that the inventive concept embodied a *permanently closed crotch* union garment with a *posterior opening extending obliquely across the seat and extending to the leg.* Obviously, the fact, if it were such, that prior to the plaintiff's endeavors a *permanently* closed crotch, except the particular types disclosing the wide opening and drop fall flap, was unknown, or the further fact, if it be assumed, that no one had been able to devise an opening other than the Devoe or Graham types, which, in a closed crotch, was practical in respect of the degree of closure and the comfort and convenience demanded by users—either or both of these facts or assumptions may well have been persuasive in support of the view that a construction, disclosing a permanently closed crotch with an oblique opening from near the waist line at one side and extending across the seat into the opposite leg, was patentably novel; that it really was, as is claimed, a *permanently closed crotch garment,* with a new type of opening.

That is to say, granted that Scott and Prue did not disclose true permanently closed crotch garments, that Graham and Devoe are distinguishable as closed crotch with wide cut-out openings coverable by drop flaps, and that no other form of permanently closed crotch in connection with any other sort of opening was known, then the contention that a permanently closed crotch, with an oblique opening across the seat extending to the inner side of the leg, could be distinguished from Scott, who disclosed a vertical opening without a *permanently* closed crotch, from Prue, with a vertical slit convertibly open or closed at the crotch, from Graham, with its wide opening and drop fall covering, or from Devoe, with its triangular opening (which, however, was capable of considerable structural variation) formed by extending it into the leg portion of the garment at both sides, could well be accepted by the primary examiner. He evidently felt that the advance was sufficient to support the claim of invention, and his characterization of it as "slight" or "simple" makes no difference, now that this claim, which concededly discloses plaintiff's invention in specific language, has been allowed.

Recurring, now, to the proceedings for prosecution of the claims before the appeal board, this attitude is in substance taken by the applicant: That, although the allowed claim covered the precise disclosure of the drawings in almost the language of the specifications, it was "good as far as it goes," but that "in view of the distinctly novel character of the posterior opening of appellant's garment, and the unquestionable advantages secured thereby, * * * it is wholly unreasonable to force the appellant to accept a claim wholly inadequate

to protect his real invention," and the purpose is again disclosed of securing the allowance of claim 1 as a basic claim broad enough to cover, in a union garment, any *permanently closed crotch*, with *any* posterior opening, having only the characteristic, already noted, of extending from a point near the waist line to a point below the crotch, in one leg only. In other words, except for limitations imposed by "substantially as described," there are none; as (a) that the opening be oblique or extending across the seat; (b) that it extend below the crotch into the inner side of the leg opposite the point of beginning. In terms it is a claim subject to anticipation or infringement by any closed crotch garment showing a posterior opening, which extends from any point *near the waist line* to *any point* in *either leg, but in one leg only, below the crotch.* By way of illustration, it may be noted that the Devoe garment, with the flap sewed on one side, would infringe the plain terms of the claim. As observed by the Court of Appeals of the Second Circuit in Johnson v. Lambert, referred to, if the claim is valid, and the contentions concerning it are sound, the patentee justly "will either dominate the practical art or exercise a major control over it."

A most careful study of the file convinces me that the patentee, not only made no showing which was accepted by the appeal board as justifying his complaint that claim 4 (3) was "wholly inadequate," calling for the allowance of claim 1 to be as broad and comprehensive as its language, but that the action of the board upon the claims before it for allowance or rejection is repugnant thereto. Now, at this time, claim 1 stood as it had throughout the proceedings; the amendments being the specification of a *permanently* closed crotch and the extension of the opening into one leg only. Claim 4 (present claim 3) had been allowed. The then claims 2, 3, 5, and 6, rejected by the primary examiner, and which, with rejected claim 1, were the subject of appeal, read thus:

"(2) An undergarment having a *permanently* closed *crotch* and a *posterior opening extending from a point in the back above the crotch to a point in the inner portion of the leg below* the crotch, and a flap, adapted to button over and close." etc.

"(3) An undergarment having a permanently closed crotch and a *posterior opening extending from substantially the waist line to a point in the opposite leg below the crotch,* the inner wall of said opening being formed by a part of the body and leg portions of the garment, and the outer wall being formed by a sewed-in flap having a free portion adapted to fasten."

Claims 5 and 6 covered, as noted, "a posterior opening, a permanently closed crotch, a flap," etc., and a "permanently closed crotch, and a posterior opening formed between a pair of lapped members," respectively. Bearing in mind that the then allowed claim 4 covered, concededly, the applicant's exact disclosures, the feature of the situation is that the then claims 2 and 3, in so far as they attempt to embody and describe the "opening" of his construction—the italicized words above—do so in language of breadth and meaning almost identical with that found in rejected claim 1: and we find the appeal board, after citing the four references, Devoe et al., supra, in a brief opinion, disposing of the matter thus:

"The primary examiner has rejected the appealed claims on the ground that they do not involve invention over what he has allowed to the applicant in claim 4 (present claim 3), particularly in view of the references cited. We are of opinion that his action was right so far as claims 2, 3, 5, and 6 are concerned. Claims 2 and 5 are met, moreover, in either Devoe or Graham, and claim 6 involves nothing more than sewing up the fall piece *A* of Devoe along one side. This certainly is not invention. While claim 3 *suggests a distinction*, that distinction is not *clearly brought out*. This claim is therefore also considered met in *each of the Devoe and Graham patents*."

The "distinction" which claim 3 suggests, as the board doubtless conceived, is disclosed in this further language:

"It is also believed that claim 3 should be allowed, if amended by inserting after the word 'line' in the third line of the claim, as appearing in the examiner's statement, 'at one side of the center.' It is recommended that such a claim, if duly presented, be admitted and allowed; no new ground of rejection or objection appearing."

Obviously the suggestion was prompted by the board's conception of the character of applicant's opening as disclosed in his drawings, specifications, and claim allowed by the examiner, viz. the limitation respecting the *oblique opening extending across the seat*. And it is significant that this "suggestion" was disclosed by the board after it had. agreed with the primary examiner in his rejection of the then claim 3, and after it had expressed these views *respecting claim 1*:

"Claim 1, however, in setting forth an opening which extends *below* the crotch *in one leg only* and from a point *near the waist line*, is believed to distinguish the applicant's particular kind of opening, and, with the other limitations of this claim, to avoid the references."

There were and are no *other* limitations, except that of a *permanently closed crotch*—the identical limitation appearing in the then rejected claim 2, and in the then rejected, and later modified and allowed, claim 3 (present claim 2). It is my judgment that this record, no matter how read, leads to the conclusion that the considerations which led both the primary and appellate examiners to reject claim 2, to suggest the amendment to claim 3 as a condition of its allowance, the reversal of the primary examiner on claim 1, and its allowance with *other limitations* (not in fact found in its language, unless the words "substantially as described" confine it to the exact disclosures of the drawings and specifications) condemn claim 1, and they forbid giving it any validity or breadth such as is now claimed for it.

[1] The record discloses that applicant's insistence upon a broad, pioneer, or revolutionary disclosure was at no time accepted by either the primary or appellate examiners. Of course, this suit does not involve merely a review of the Patent Office proceeding upon the record there made, to the end that the validity or construction of claims be determined thereon. But where, as here, the claim in controversy has a breadth of language bringing it far beyond the terms of an allowed claim which coincides with the disclosure of the drawings and specifications, the record may be most persuasive in determining whether recognition of presumptive validity, given to a patent because of its issue, shall be great, ordinary, or slight; whether such presumption may attach as well in support of broad as of narrow scope.

We therefore come to the consideration of the facts disclosed in evidence, other than the record we have reviewed, to determine their bearing upon the issue.

[2] It is established beyond the possibility of question that a permanently closed crotch union garment, not alone of the types with a wide posterior opening closed by a "drop fall" seat, but of the present conventional type, with the longitudinal opening between double or overlapping flaps, was made, sold, used, and well known in the commercial art. The testimony of the witnesses Lachner, McLaughlin, Cook, and O'Brien, in connection with exhibits, particularly Defendant's Nos. 1, 4, 5, and 7, leaves no doubt on the subject, and the testimony of one who purchased and used Defendant's Exhibit 1 as early as 1905, the testimony of a reputable dealer, of a designer, that this type of garment, the Holmes-Sterling type, was on the market from four to eight years prior to Cooper's application, and that it was known as a closed crotch garment, cannot be ignored. It establishes the fact, and overthrows the patentee's contention respecting it, before the Patent Office tribunals, and its importance rests in its showing, against the patentee, of a more crowded art, containing the very element—a permanently closed crotch— of a type upon whose *nonexistence* and previous *nondiscovery* applicant, in a considerable measure, *pressed his claim of invention.*

A second aspect of the case, and shown upon the larger art now disclosed in the evidence, is this: The use, in connection with the different types both of open and closed crotch, whether permanent or convertible, of various expedients or devices in connection with the opening, to promote adequacy in dimensions of the opening and comfort and security in the closure thereof. I think it fair to assume that the workers in the art, whether they proved to be inventors or not, all sought to attain the general object of adequacy of the opening and of the closure in respect of dimension, comfort, and convenience. But, whether the opening be longitudinal or horizontal, the *degree* of its extension up or down, from side to side, or obliquely, necessarily was a prime consideration, and the character of a union garment itself suggests, not only the approximate limits beyond which no opening can, but the limits *within* which it must, extend. For example, in a longitudinal median opening, the upper and lower limits must be approximately the waist line and the crotch vicinity.

Now, Devoe, no matter how different his type of opening or flap may be conceded to be, recognized this as a necessary recourse to obtain an adequate opening. He did not extend it (into both legs) for the sole purpose of "giving freedom to the thighs," as contended by plaintiff, but rather because the triangular inserts, depending from the waist line and attached to the side of the garment, would reduce the opening so that, except for the extension into the legs at the side (thereby including in the fall the lowering of the crotch portion of the garment when the flap was unbuttoned), the opening would be inadequate. It is true that such purpose was not declared in so many words; but it is obvious, and was so assumed in the specifications. The reference by defendant to the Mueller (British 8,766), Tichy (Austrian 2,783, 1907),

and Anderson (British 19,408, 1891), patents, no matter what distinctions in the general type of opening or garment may be pointed out, all persuasively point to the recourse in the art, to the extension, not merely to the physical limit of the crotch of the garment, but to such point in that vicinity as, in view of the upward or other extension of the opening, would give the opening such adequacy as comfort and convenience demanded.

Whether the idea of extending the opening beyond the crotch into the leg portion of the garment was "old" in the art, as stated by the primary examiner, it was not new with Johnson. It was known, and in so far as, standing alone, it involves the fundamental problem of making an opening, which must exist within certain limits, larger, by cutting it larger, or smaller, by not cutting it so large, it is quite likely that the inventive faculty need not be brought into active play for a solution. Considering, further, what appeared in the art as now shown in this record, respecting the different devices or expedients to contribute to adequacy and comfort in the openings of garments—of all types—the gusset insert appears to have been, not only known, but common. Johnson's original application included three claims covering such insert at the crotch, and, concerning its novelty and its functions, he said:

"A further feature of improvement consists in the employment of a gusset inserted at the crotch, which provides increased fullness at that point. The gusset insert, when used in connection with the other feature of the invention above referred to (the oblique opening into one leg, with a single flap, etc.), is stitched along its rear edge to the flap member and serves to increase the fullness of the latter in a desirable manner. However, the gusset insert at the crotch is capable of use advantageously with garments made to open *otherwise than* as herein shown and described, and consequently is not limited in its application and use to the particular garment herein described."

It would seem that broad novelty was claimed. But the claims were rejected on the patent to Howe, 117,885 (1871), disclosing, not a "diamond," but a "lozenge," shaped gusset—in drawers—at the crotch; its function being stated by Howe to insure "perfect freedom of movement of the legs, the fullness effected by it rendering it impossible, under any possible movement of the legs, that the cloth between them can be tightened or brought under strain," and the examiner, in rejecting claim 9, which covered the gusset, a "posterior opening extending from substantially the waist line to a point on one leg below the crotch," a flap, etc., cited Prue, "in view of the patent to Howe." The examiner's action resulted in withdrawal of the gusset claim. The specifications of the issued patent, while retaining the gusset feature, declaring that it is not indispensable, observe:

"The use of the crotch insert is, however, preferred, for the reason that it not only affords greater fullness and freedom at the crotch, but also affords greater fullness to the main flap *L*, effecting a freer gaping of the posterior opening when required."

Closely connected with the particular form of crotch insert or gusset just noted are the varied forms of seat pieces, and other types of gores, gussets, or insets. In some references and exhibits these are separate inserts, which alone are designed to give fullness to the crotch

or seat; in others, they form part of, or extensions into, the leg, of seat pieces, or flaps. Of the references before the examiner (disregarding the type of garment; i. e., whether it is a true closed crotch), Scott and Graham, as well as Howe, are striking illustrations.

That the patented art was not limited by these is abundantly shown by the additional references in the case, viz. Goldberger, Cook, Hill, Pennington, Hanks, Gould, and others, all issued prior to Johnson's application. That the true function of these devices or expedients was known cannot be doubted. That they were quite generally either assumed or declared to be means, not only to promote adequacy, comfort, and convenience of an opening, but necessarily determining factors in *the location* of an opening, is likewise plain; and the Holmes or Sterling garments, in evidence, regardless of their status as patented constructions, serve as excellent illustrations, because they are closed crotch types, with the longitudinal opening covered by opposing double flaps.

Johnson, in his argument before the appeal board respecting claim 1, recognized this very matter, in his attempted distinction between Devoe and Graham. After noting that the former extended the opening into both legs, and asserting that it was done to give "freedom to the thighs," he continues:·

"Comparing Devoe and Graham, it will be noted that the latter employs a gusset inset, 8, Fig. 1, to widen the thigh parts of the legs, and consequently Graham does not need to extend his opening below the crotch."

To say that the gusset is inserted to widen the thigh parts of the leg, or that the extended opening into the legs gives freedom to the thighs, as already noted, neither negatives nor can it ignore the obvious result of thereby contributing to the adequacy and comfort, to say nothing of the particular *location* of the opening.

These considerations, when weighed in the light of the art thus disclosed, particularly the Holmes-Sterling garment, throw much light upon the soundness of Johnson's principal contention, repeatedly urged, in support of claim 1 for a broad invention. Thus, without asserting that the claim covered the oblique opening across the seat, and apparently ignoring the directions for excision of a part of the back, as contained in the drawings and specifications, he states the conceived idea to be:

"Running a narrow slit from a point in the back at about the waist line down to the inner portion of one leg well below the crotch. * * * The character and location of the posterior opening thus lies at the foundation of the present invention. By carrying the opening down into one leg below the crotch, an opening of sufficient length is obtained for practical service by simply drawing apart the longitudinal sides or edges of the opening, enabling the closed crotch feature to be preserved intact. On the other hand, when the wearer stands erect, *the longitudinal pull on the garment* draws these sides *closely together in overlapped relation*, making even the single oblique flap * * * practically unnecessary."

The soundness of this contention may be conceded in respect of an *oblique opening*, such as the drawings, specifications, and claim 3 embody. But with respect to a closed crotch garment of the Holmes type it is equally true, and its truth depends, not upon the fact that the

opening does or does not extend into the leg, but upon overlapping of the double flaps, whose edges at the upper ends are fastened at or beyond the median line of the back, and at their lower ends are likewise fastened in the overlapping or crossed relation at the crotch, or are fashioned with gusset or gore extending into the legs, that the longitudinal pull, so far as it is effective in any of these garments, draws the flaps together. The three prior art exhibits of the Holmes or Sterling garment, produced by defendant, afford striking proof of this, and equally, if not more so, does the "Mentor" garment, marked under plaintiff's patent and made by a licensee. It is not possible, in any of these garments having the conventional longitudinal opening, that the extension of the opening into one leg can contribute toward effecting a closure of the flaps through longitudinal pull; but it is due to the relations which the flaps bear to each other, and which their outer edges bear to the median line of the garment.

The defendant therefore established the two facts: (1) That at the date of Johnson's application a *permanently closed crotch* union garment of a type other than with the wide posterior opening covered by the drop fall flap was known and had been in use, as the testimony shows; and (2) that the extension of the posterior opening into the leg or legs of such a garment, for the purpose of promoting adequacy, comfort, and convenience in service, was likewise known.

In my judgment these give conclusive support to the view heretofore expressed that, upon the patent, its drawings, and specifications, read in the light of the proceedings for its allowance, it was impossible to grant to Johnson a broad claim for invention of a posterior opening in a permanently closed crotch garment characterized only by (a) its extension from a point near the waist line, (b) to a point below the crotch, (c) in one leg only; and when the art, as appears in this record, was not limited, but well crowded, and affords, as does every branch of the garment-making art, such wide range for the exercise of skill in designing, it is impossible to say that Johnson became an inventor by importing into garments of the Holmes type the known notion of enlarging an opening by extending it further downward, below the crotch, though in one leg only.

There is no showing in this case that the patent in suit brought about a marked change in the commercial art. The testimony, while showing that the garments put out by plaintiff's licensees have proven acceptable to the trade, does not show that a closed crotch garment, which is of the distinctive type disclosed in plaintiff's drawings and specifications, the oblique opening, has, because of that fact, tended to supersede other styles of true closed crotch garments. On the contrary, there is every reason to believe that the success of plaintiff's licensees has been but their share of the enormous development in the entire knit goods industry, and there is good reason to believe that some of it has been attributable to aggressive advertising of a monopoly right in respect of "closed crotch" union garments. Atlas Underwear Co. v. Cooper Underwear Co. (D. C.) 210 Fed. 347.

This, as well as considerations to be referred to in discussing infringement, preclude entertaining the success of plaintiff's licensees—

even if the validity of claim 1 were in doubt—because, in view of the state of the art, they add to, rather than tend to solve, doubt. I therefore conclude that claim 1 is invalid.

[3] With respect to claims 2 and 3, their validity need not be considered, because the determination of the issue of infringement will, in my judgment, fairly dispose of that branch of the case. In doing so, the assumed validity must be limited to what has been observed with respect to these claims, viz. that upon the face of the patent and the proceedings leading to their allowance they embody the particular disclosure shown, and neither can go beyond what can be said to be an *oblique opening*, capable of ready and substantial differentiation from the conventional longitudinal opening, and the specific method of closure. Now, on inspection of the garments in evidence, those which appear to be marked and made under the patent, and defendant's alleged infringing garment, it may be said with confidence that one only—specially made as in strict compliance with the specifications and drawings—can be recognized as embodying the specific construction; and, generally speaking, every one is of the double flap type, covering a longitudinal opening in the center line of the garment.

A careful examination fails to disclose a garment (excepting possibly the one noted) wherein the opening—and by that is meant the opening when it is open—is not, at its upper end, in the center of the garment near the waist line. True, a number of exhibits show that the upper end of the *initial incision* in the tubular blank is off center; but without exception, I believe, each of these shows that immediate compensation for this is made by overlapping double flaps of *unequal width*, so that the *width of the flaps and their unequal points of attachment at the waist line* practically obliterate the original incision at that point, and, when drawn apart, traverse each others' edges, exactly in the center line, and *that* forms the upper end of the opening. The result, therefore, is precisely identical with that found in defendant's and the Holmes and Sterling garments, where the incision is in the exact center, and the overlapping flaps at that point are of equal width.

Again, with the exception noted, not a commercial garment of the present or prior art shows Johnson's novel excision for an opening but they quite uniformly disclose a cutting similar to that employed in Scott and Holmes, if not Prue; and one is impressed with the fact that, given the permanently closed crotch and type of opening and flaps found in Holmes, these later commercial garments are all variations in design more closely derivative from Holmes and Scott than from Johnson's novel excised opening. Even if it be granted that garments such as Plaintiff's Exhibits 3, 9, and 13, are to be taken as showing an opening distinguishable from Holmes because of the wide flap or seat piece and an extension into one leg, that result is accomplished, in my judgment, not by following the teachings of the Johnson patent, but rather by resort to the expedients of the known art, discussed in connection with claim 1, for making an opening adequate and giving to it a desired location.

This is sharply brought out on comparison of defendant's garment with Plaintiff's Exhibit 9. If the latter be taken as distinctive from

Holmes, because it has a wide seat piece and a true extension of the opening into one leg, the defendant, by introducing the second flap of considerable width and attaching its lower end to the in-seam of the leg in the crotch vicinity, so that this flap serves to fix the lower limit of the opening substantially *at the crotch,* recurs to Holmes or Sterling in their use of overlapping flaps and gusset or thigh gore extensions, and not to the patent in suit. In other words, these matters pertain not so much to the character of the initial cutting or incision or excision, but rather to the kind of flap or closure and its upper and lower attachment (or extension by means of a gore or its equivalent) as will be most conducive to adequacy and comfort. Indeed, as it seems to me, Johnson attempted to obtain recognition of these considerations in claim 5 which was disallowed:

"An undergarment having a permanently closed crotch and a posterior opening *formed* between a pair of lapped members, the latter being permanently united to each other at both ends of said opening, substantially as described."

This, so the patentee asserts in the file, "was addressed to a distinct feature of novelty in the structure of the posterior opening, *irrespective* of the exact extent and location of said opening in the back of the garment. Scott and Prue are sought to be distinguished from this claim because the "lapped members" are not attached to each other, and because these references did not disclose "closed crotch garments." Obviously Holmes and Sterling forbade the allowance of such claim, even though not cited; and in any event, upon the issue of infringement, claims 2 and 3 should not, by construction, be given a breadth practically coincident with claim 1, or disallowed claims 2 or 5.

The record and exhibits in this case, showing, as they do, not only a large patented and a large commercial art—not merely closed crotch garments—but also such variations of style and design that the problem of assigning a particular garment to a particular patent, as covering its construction, has been found practically impossible of solution. If, for example, Johnson's patent justifies the variation to be found between the garment made in accordance therewith (Defendant's Exhibit 19), and the so-called "Mentor" garment, it is difficult to see how a like amount of variation in Prue or Holmes or Scott (if the closed crotch of Holmes be recognized) forbids defendant's garment.

The conclusion is that claims 2 and 3 are not infringed, and a decree dismissing the bill may be entered.